Mr. Hadley, our next case is ENGAGE LEARNING v. Department of Interior. Mr. Friedman? Mr. Friedman, that's correct. Thank you, Your Honors. May it please the Court, in preparing for this argument, I was thinking back when I opened my practice, I was given a plaque by a client. It's the old Lincoln phrase that a lawyer's time and advice is his stock and trade. ENGAGE LEARNING is analogous to that. Their time and advice is their stock and trade. What contracting officer with contracting authority authorized services beyond $66,000? Well, first of all, Keith King did on numerous occasions. Which contracting officer with contracting authority authorized services beyond $66,000? Keith King. Who? Keith King. On numerous occasions. King. Can you show us that in the record? He has authority to do that? He is, I think, stipulated as the contracting officer. There would be no dispute in that. And can you show us where he authorized services? I'm not following you, Your Honor. There were, on innumerable occasions, he authorized services well beyond the $65,000 to the point where he authorized services to approximately $380,000. However, Keith King authorized all of those increases past the $65,000. Isn't the issue here $80,000 arguably authorized by Ms. Shaughnessy but not Keith King? Yes. And where is, I think what Judge Rage is getting at, where is the authority for Ms. Shaughnessy to have authorized that $80,000 of work? We believe it was clear that she had the implied authority to do that, that she had been designated by Mr. King to take control of this contract, these contracts, these series of contracts. He had basically, in effect, abdicated his authority. He was notoriously absent. He didn't come to work. He didn't do his job. He abdicated his authority. In effect. Authority can be created in a second person by the abdication by a first person. Well, Your Honor, in this particular case, that's exactly what happened. He did not come to work. He did not process the request. He left her to do so. He left her to do all of the things necessary to make a contract. He left her to make the scope of work, the price. She determined that they were a sole source provider. She arranged for conferences, seminars, site visits. She did everything that he should have done or should have approved in his absence. Let me ask you a question about the Johnson Affidavit or the Johnson Declaration. There's a sworn statement that Mr. King gave verbal authority. Now, was the verbal authority that that declaration addresses itself to relating to this specific $80,000 that you're claiming? It was part of it. It was about $35,000 of it, yes. Okay. So you're saying that he gave verbal authority on $35,000 and then the other, the rest of it, the remainder, you're arguing that that was the authority that was delegated to Ms. Shaughnessy? Yes. And it was delegated over a period of time. This didn't happen immediately. These parties had a course of dealing over quite a period of time. Do you have any support for the idea that a contracting officer can delegate their authority? My support for my theory is really in the CEMS Inc. case, VUS. That case is cited in our brief, and it talks about that case recognizes implied actual authority. That's what it says. Implied actual authority for a contracting officer's representative to be treated like or in the same shoes as a contracting officer. And that is our theory in this case is that during the course of dealing here and over the course of time here, Lana Shaughnessy became the contracting officer and that the petitioners had every right to believe that she had authority under the theory of implied actual authority. How do you distinguish between implied actual authority and apparent authority? That's an interesting question. I'm not... That's why I asked. Well, it's a great question. I think it has to do with, in this case, well, first of all, she, meaning Lana Shaughnessy, swears in her affidavit that she had the authority, that she was the contracting officer's representative. She swears in the affidavit that she was his authorized representative. So, frankly, I think that's a big function, a big factor right there. But additionally, what had happened over the course of time was that because Keith King didn't come to work and because he didn't do his job, they frequently had to actually even start work, begin the process. One day he approved a contract, well, actually, a different contracting officer approved a contract four days into a five-day seminar. In this case, ratification of existing work or just completed work became the norm. That became the norm in this course of dealing. And what appears to have happened is that Mr. King at some point was called on the carpet for that and then issued, apparently, some memo that we found four years after the fact that said that he was not going to be ratifying contracts. Well, if Mr. King did not have the authority to delegate to Ms. Shaughnessy, then does the fact that Ms. Shaughnessy thought he was delegating to her make any difference? I assume she very well believed that or she wouldn't have issued a declaration to that effect. But if he never had the authority to pass it on to her, I understand the practical reality is that they wouldn't have been able to function without somebody doing it, but that doesn't answer the legal question. I think it does go to the CEMS case in which it was a similar set of circumstances, a project engineer on a large bike path situation. The project engineer probably didn't have actual authority. But in the CEMS case, each time the contracting officer's representative acted, they modified the contract. After the fact. Did that happen here? Both times. Yes, absolutely. They changed the contract. Absolutely. The cases are almost on all fours. The CEMS case involves a project engineer on site directing the construction company, changes, indicating that this change needs to be made on the base or this change needs to be made here and there, and that it will be addressed later and it was addressed later. The contract modifications were made after the fact. I feel the CEMS case is very similar in that regard. In that regard, they didn't have a contracting officer that had advocated or had stopped working, but they didn't have a contracting officer who was on site, and they had somebody who was on site who was making on-the-fly changes that involved significant modifications to the contract. Very similar to what we have here. Is this a jurisdictional question? I'm glad you asked that. Yes, it is. And one of the key cases here, the Bell v. Hood case, is a Supreme Court case, which I think is controlling here. I believe it should be controlling here. In this case, the Civilian Board of Contract Appeals administrative judge ruled, decided that the board would not take jurisdiction after making approximately 12 pages of factual findings weighing on credibility. There was a contract here, right? There was an initial contract. So didn't the board have jurisdiction over actions purportedly taken under that contract? And even if you lose on whether the actions that she took were authorized, there's still jurisdiction, wasn't there? Yes. Absolutely. The government argues alternatively, if we disagree with their jurisdictional theory, that we should just say that summary judgment should be entered. What material issues of fact do you think prevent summary judgment, and what is your evidence to create those material issues of fact? Thank you. A number, frankly. In the course of dealing, the affidavit of Lana Shaughnessy in and of itself should defeat it. Now, she said she had authority, but does she actually expressly state that Mr. King delegated that authority to her? Your Honor, her affidavit does not give me a specific appointment, if you will, as to on what date or at time she was given that authority and by whom. I just know that when contacted, she said I had, I was the contractor's representative or contracting officer's representative and had that authority. So I can't give you that specific answer at this point. I can just tell you that she has stated to us that she was the contracting officer's representative and had the authority to enter into these additional contracts or modification of the original contract. She would, I think, refer to all of this as a modification, I don't think, I know, to the original contract. The original contract was probably erroneous in the way it was scoped. And it did not take into account the number of visits that were going to be anticipated. And so she would, I think, state that what was really being done were modifications to the original contract. Not extras, though, and that's, I think, an important factor here. This isn't somebody in there claiming I did something more and need extras. I put a better finish on a job or something. These are separate and distinct site visits, seminars, conferences that were authorized, not authorized, requested and authorized by Ms. Shaughnessy. Is there anything in the record that indicates that to the extent that she possessed that authority, that she possessed it by delegation from Mr. King? I have no writing that is in the record that would say that. Okay, no declaration to that effect, no? I'm not aware of any. Mr. King doesn't back that up. Mr. King's credibility should be probably the most suspect issue of this entire case. He didn't go to work. He just simply didn't go to work. Doesn't that cast doubt on whether he authorized Ms. Shaughnessy's additional actions? I would say it probably goes the other way, Your Honor. I think that what it shows is that— As you said, by default, by abdication. I think he abdicated, and I think he did it intentionally, and I think that only in a self-serving, unsigned memorandum that was provided four years after the fact does he say that he didn't. When did he pass away? I don't know exactly. It was—I guess we don't know. It was not long after all this. I think he just drank himself to death. You want to save a little rebuttal time? Thank you. Thank you. Ms. Vanman? May it please the Court. What's notable about this case and this argument about implied authority is what is lacking. There's no evidence whatsoever that—actually, to support a lot of the allegations about Mr. King that were made this morning. There's no evidence that he delegated authority to Ms. Shaughnessy nor any legal authority by which he could have done so. In fact, the relatively contemporaneous evidence establishes otherwise in the July 28, 2004 letter to Engage Learning that is— But the board actually engaged in credibility determinations here, didn't they? I mean, they basically said that they discounted Ms. Johnson's affidavit. They discounted Ms. Shaughnessy's affidavit. And they essentially credited some written statements for Mr. King despite the fact that he wasn't there to explain any of them. It wasn't really a question of credibility, Your Honor. It was a question of looking at the objective evidence. What were the contemporaneous documents? What was the written evidence in the record? What was not? The affidavits that Engage Learning submitted were terribly bare-boned with no details, no context or anything. Is that kind of analysis the thing that's supposed to be done on the papers like this? The burden is on Engage Learning to establish jurisdiction, and the burden of the risk that Ms. Shaughnessy lacked authority is on Engage Learning. Let me ask you about this jurisdictional issue. I mean, your jurisdictional statute for the board says that the board has jurisdiction to decide any appeal from a decision of a contracting officer of any executive agency relative to a contract made by that agency. So are you saying that you can decide and make fact findings that you think a contract doesn't exist? I mean, every single time you're going to have an appeal to the board, it's going to relate to either the scope of a contract or whether something was covered by a contract. I mean, you could just basically jurisdiction yourself out of business if you wanted to by saying we decide up front the merits and then call it a jurisdictional determination. Two points, Your Honor. The Cedars-Sinai case from this court and other decisions talk about jurisdictional facts, and when a complaint is filed, and this complaint was very bare-bones, the board has the authority and actually gave Engage Learning opportunities to submit facts so that the board could look at the jurisdictional facts to decide whether it had jurisdiction, whether there was a contract. There's clearly no express contract for the services at issue, and the board decided based on the evidence. But there was a contract, and then there are declarations that these effectively were amendments to the contract. There was a contract. There were absolutely no modifications to this particular contract contrary to what my opposing counsel has said. There are documents in the record. Is that a distinction from the CEMS case? One of them, but in the CEMS case, the contracting officer actually delegated some very limited authority to the project engineer on site. Here, there's no evidence that the contracting officer did or could delegate any authority to Ms. Shaughnessy, who was a program person. Ms. Shaughnessy was in a chain of command of a program, and these requisitions that she signed were not contracts. They were basically her recommendations up her program chain to the director of the Office of Indian Education Programs about what consulting services she would like. As a matter of fact, when she signed them, then they had to be signed off by her director. That was a big difference between the requisition, which is a quest for services, and a contract. The only, as we've established in our brief, there are only a couple of contracts here. One, the 20259 that was fully performed. One in September that was signed either shortly before or during this additional training. And one finally signed in February of 2003 for more than a million dollars. And to the extent Engaged Learning claims that this original contract for 66,000 was underfunded kind of proves our point. There was no contract for services above and beyond that 66,000 for the services performed in October to December of 2002. The February of 2003 contract that was signed based on earlier requisitions that Ms. Shaughnessy prepared was her work going forward. Similarly, the 11005 that they claim for the Cottonwood School in 04, there's nothing to show a contract there because the only evidence that Engaged Learning submitted was this planning form that the principal of the school signed for services that she wanted.  And again, it hasn't been addressed in argument, but we addressed in our brief that to the extent Engaged Learning is arguing a course of dealing, which it didn't plead below and didn't really put in its brief, it may be related to the No Child Left Behind provisions, and that was the 11005. But there were five statutory conditions that had to be met in order for that money to be paid out to Engaged Learning. There's no evidence whatsoever that any of those conditions were met. What about the $35,000 that Ms. Johnson swears was authorized directly by Mr. King? The $35,000 was for the September contract that was signed. The affidavit that Ms. Shaughnessy submits and the affidavits that Engaged Learning submitted never gave any details about what contract, what services, where, when, by whom, what it involved. So there's no evidence in the record on any alleged $35,000 that Contracting Officer King allegedly authorized. And there's, to the extent any of it might have been... Isn't a declaration under oath sufficient to create a fact dispute on that point? You're just saying you wanted to, you ignored it. No, the board looked at it, but given that it said virtually... Well, Ms. Shaughnessy's affidavits said basically she thought she had contracting authority, but there's no legal authority for that. There's no factual basis. In response to earlier questions, if the court were to decide that this is not a jurisdictional issue under the trauma service case, the court could affirm the judgment of the board, given that the government had moved to dismiss for failure to state a claim. Because under the Bell case, the claim, the complaint, all the objective evidence was inherently implausible that Ms. Shaughnessy had any kind of contracting authority whatsoever. But on failure to state a claim, we can't make factual findings. We can't look at all the factual determinations that the board made, could we? In a sense, yes, they're analogous to the jurisdictional facts, because in order for the court to decide, and CDA review is de novo, so the court could look at this record, even though the board did not decide the government's alternative motion to dismiss, the court could affirm the judgment of the board. But to do that, we would only be able to look at the claim, not the underlying facts, right? The court could look at the claim, everything that's in the record with respect to the motion to dismiss that the government filed, including the documents that are there, considering what documents are not there. In, I would point out this July 28, 2004 letter that Contracting Officer King sent to Engage Learning, basically saying, and that's at 101 in the appendix, essentially there were no contracts, there will be no ratification, because none could be made, he made three points. And actually, Ms. Shaughnessy, under Interior Department provisions, is personally liable, so basically, we have a complaint, she's the one that's personally liable, the government is not, given the lack of authority issue. Ms. Vanderman, your brief says that whatever the holding of CEMS is, FlexLab basically overrules it. What's the holding of FlexLab? Well, FlexLab, I apologize, there may have been an overstatement. FlexFab is a more recent case where actually the court held that a subcontractor had standing to sue, but there was no implied, in fact, contract. And at the end of the FlexFab decision, the court actually suggested that, without stating it, that jurisdiction could be an issue, given the doctrine of sovereign immunity. Basically, the court said the courthouse doors, or doors of the boards of contracts appeal, should be not opened wide to victims of unauthorized actions of government agents. But it never addressed the implied actual authority issue, did it? Well, actually, as a general rule, it basically said that only contracting officers have the authority that was grounded in the public policy to protect the FISC, and under certain limited conditions of the FAR, the CO can delegate authority. And it didn't go off on the implied, in fact, contract. But the CEMS case, which is the only one upon which engaged learning relies, is distinguishable for the reasons that I addressed earlier, plus that's not binding on this court. It's a court of federal claims decision. But to the extent that engaged learning talks about all this evidence, I would respectfully assert that there's really very little, if anything, in the record to support the claim. And in fact, this July 04 letter written by Mr. King with a copy to Lana Shaughnessy and the deputy director of the program basically says we're not going to pay because she didn't have the authority. But that's disputed, isn't it? No, they never disputed that letter. What they disputed was the earlier October 2002 memo, which Mr. King referenced in this July 04 letter. The dispute over the October 2002 memo was that originally it was not in the contract file. It was found in the files of the office inspector general at Department of Interior. And the agency counsel who handled the case below submitted the necessary statement under Rule 901 for it to come into evidence, and it's within the board's discretion to admit it. I have some questions on whether it was ever really prepared in the normal course of business. I mean, it is a little suspect that the only time this thing shows up is when Mr. King's being investigated, and it never showed up in the contemporaneous files. I mean, these are things that the board's making actual credibility determinants. It's not suspicious, Your Honor, in the sense that it was a document from the contract file that the agency attorney said and was in the OIG file. We don't know exactly what the OIG was investigating, whether it was Mr. King or Ms. Shaughnessy or whatever. We don't know. Yeah, but the counsel wasn't able to say it was actually in the contract file or that it was prepared in the normal course of business. All they said is it showed up in the OIG file. That's all they said. It could have come from anywhere. Well, Your Honor, I believe that given the presumption of regularity with government officials that counsel's representation to the board that it was found in the OIG files and produced it as soon as it was found is proper and appropriate. Papers get misplaced sometimes, but as the board said, neither the board nor the court would need to actually rely upon that memo because of the July 04 letter that Mr. King wrote that actually talks about that memo but explains to Engage Learning that Ms. Shaughnessy didn't have authority. She never had authority. They were not going to ratify any of these unauthorized commitments. There were no mods to the contract, contrary to what my opposing counsel said, and he said we can't ratify because it wouldn't have been proper legally, even if the contracting officer had tried to make it, Another chain of command that's important here is Shaughnessy was in the program side. Her supervisor was the director of the program. There was a contracting chain of command. There were only two contracting officers, King and Nelson, so it was not reasonable for Engage Learning to think that anybody else had authority. There was a competition advocate who had to approve any sole source contracts. There's at least one memo in the record that Ms. Shaughnessy prepared recommending sole source award was not signed. There was at least one memo in the record that she prepared recommending ratification that was not signed. Her responsibilities were programmatic. What do you think of your opponent's theory of implied authority by abdication? There's absolutely no support for that, Your Honor. It would turn government contracting upside down. Given FlexFlab, which talks about the general rule that only contracting officers have authority, given all the provisions in the FAR, given federal crop insurance remerial from the 1940s where the risk is clearly placed upon a party like Engage Learning, to bear the risk if a government agent engages in actions that are unauthorized, there's absolutely no support for concluding that she had authority based on some kind of abdication. And in any event, there's absolutely no evidence in the record that he abdicated his authority. As a matter of fact, Engage Learning put in the record this procurement manual that Contracting Officer King had drafted that shows exactly that he understood completely what the rules were and the authority limits were on contracting officers, listed the names of contracting officers. It's really fundamental to government contracting that only contracting officers have authority unless there's some very unusual and expressed legally permissible delegation of authority. Thank you, Ms. Bannon. Thank you very much. Very briefly, this court in FlexFlab, in a footnote, states very clearly, in referring to the contracting officers throughout, we include, of course, any person authorized to represent the contracting officer in the process of negotiation, formation, and modification of the contract. FlexFlab clearly contemplates that contracting officers will be delegating authority to their representatives, which is what happened here. In – I use the term abdicate, and I think in a way that's a good description of it, but I don't think it was – I want to make it clear that it's not my theory that it happened at one time where he pulled out his sword and dubbed her his representative. It was a process that took place over a period of time, basically due to his absenteeism and failures to perform his work. Somebody had to do it. Did you ask for an evidentiary hearing on these questions? I believe we did. Frankly, I can't answer that question off the top of my head. Okay. I'm sure we did. Okay. The – I don't have anything further. Thank you, Mr. Friedman.